## F. S. Marshall Company v. Brashear.

(Decided February 6, 1931.)

J. E. WISE and FAUREST & FRAUREST for appellant.

JAMES & JAMES for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER— Reversing.

Mrs. L. E. Brashear, by this action, sought to recover of the F. S. Marshall Company $5,000 for unlawful arrest and $5,000 for malicious prosecution. She recovered a judgment for $1,000, and the Marshall Company has appealed.

As we have reached the conclusion that the Marshall Company was entitled to a directed verdict in its favor upon both claims, it is necessary that we set out briefly the facts giving rise to this litigation. The Marshall Company conducts in Elizabethtown, Ky., a retail store wherein it keeps for sale various small articles of merchandise which it displays and sells on the plan, of what is generally known as "A 5 and 10 cents Store," although this Marshall Company does not limit itself to the handling of 5 and 10 cent articles only, but carries and sells upon the same plan articles of greater value.

Into this store, on Monday, December 16, 1929, came the plaintiff, Mrs. Brashear, and her husband. She returned a princess slip which she obtained permission from J. W. Thomas, the man in charge of the store, to exchange for some other articles, and she made some

small purchases, then left, and shortly thereafter returned to the store alone.

The goods in this store are displayed on counters, with a clerk in charge of 2 or 3 counters which are usually grouped together, but on this particular occasion, although it had 21 clerks, there were some counters or groups of counters at which there was no attendant. When Mrs. Brashear came into the store the second time some one of these clerks said to Mr. Thomas, "That lady is back in the store." Thomas had not lived in that community and was not well acquainted, and when he got this report he turned to a Mr. W. T. Small, a resident of Elizabethtown, but who had no connection with the store and had merely dropped in; Thomas asked Small if he knew the lady (Mrs. Brashear). He told him he did not, and Thomas asked Small to watch her, and Thomas went to another part of the store, where, though partially concealed by a display of hats, he could still watch Mrs. Brashear and her movements.

She went to the counter or group of counters where hosiery and similar articles were on display. She there picked up a pair of men's socks which she said she laid across her arm, but which Thomas and Small said she endeavored to conceal by placing over them a handkerchief or some of the purchases she had made on the first trip. There was no clerk at this hosiery counter, and Mrs. Brashear testified it was the custom in that store when there was no attendant at the counter for the customer to select the article desired and take it to another counter whereat there was an attendant and there have it wrapped up and to pay for it. That such was the custom seems not to be disputed, and, after Mrs. Brashear had selected this pair of socks, she went to a counter where lace and similar articles were on display, she selected some lace and paid for it, but did not show to the attendant, the socks she had selected, nor did she offer to pay for them. To Thomas, who was in the front of the store, Small reported that Mrs. Brashear got some socks and Thomas said, "Yes, I saw her."

This counter whereat she bought the lace was in the front part of the store. After getting the report from Small, Thomas walked over to where Mrs. Brashear was, and she asked him about some rugs. He told her he had

some rugs in the back part of the store and went with her to the rear of the store where she selected a rug.

At this point some conflict appears in the evidence. She says that she stooped over and examined the rugs, but Thomas says that did not occur. The relevancy of this claim of stooping over to examine the rugs will appear later. She said that when she selected the rugs she handed to Thomas a dollar bill and he said to her "Do you want to pay for the hose and the rug?" And she says she said, "I do." Thomas' account of this is that after she had selected the rug she gave him a dollar and he gave the rug and the dollar to the attendant at the counter, the change was made and the rug wrapped up, and that he gave her the change and asked her if that was all and she said, "Yes, I think that is all." That he then said: "Well what about the hose, didn't you get a pair of hose?" "No, I didn't get any hose; I don't know anything about any hose." Thomas said, "I thought I saw you get a pair up there," and she said again, "No, I don't know anything about them." Thomas suggested to her that perhaps the hose had dropped in her umbrella and she said, "Here are my bundles look in them." Thomas said he looked in the bundles and she handed him her umbrella and he opened that and he looked in it and found nothing, then said to her: "I know you have got them and I want you to produce them and if you don't I'm going to get a warrant and have you searched." Thomas says she had on a coat which she had buttoned around her and when he told her this she opened the coat and produced the hose from under the coat. She admits that when he asked about the socks she looked among the bundles on her arm for them and they were not there and she found them inside her coat and handed them to him and she accounts for them being inside her coat by a supposition that when she stooped over to examine the rug the socks had slipped off of the bundles she had on her arm and fallen in her coat, and that Thomas then said to her, "I'm going to have you arrested and searched," and that he did search her, examined her pocketbook and her bundles and her umbrella, and proceeded rather roughly in so doing. That he said to her, "You stole 2 boxes of handkerchiefs here Saturday and I believe you stole the princess slip;" that he sent out for a policeman, and, when the policeman came, that Thomas said to him, "I have found this woman shoplifting. I

want you to take her to the police court." Thomas admitted he sent for a policeman, and when the policeman came that he said to him, "I have caught this lady shoplifting. What will I do about it?" That the policeman said, "You go to the city hall and get a warrant." So Thomas left and went to the city hall. After Thomas left the policeman said he talked with Mrs. Brashear awhile and said to her, "There is a good deal of notoriety about this, and if you don't care we'll walk on up there." And when they got there the warrant was read to Mrs. Brashear and she was arrested. She was tried that afternoon for petit larceny, and the jury failed to agree. Another trial was had on Monday, December 30th, and again the jury failed to agree. At that time an agreement seems to have been entered into that the warrant should be filed away and the matter dropped, but, some days later Mrs. Brashear came back, and, on her motion, the warrant was reinstated, and on Friday, January 24, 1930, she was tried the third time and was acquitted, and 4 days thereafter she began this suit.

We shall consider first the alleged false arrest. To sustain a recovery for this, it is necessary that Mrs. Brashear establish that she was wrongfully arrested. The arrest of her that was made in the city hall when the warrant of arrest was read to her will not avail her, because that arrest merged into and was a part of the prosecution which we will consider later under the heading of malicious prosecution. If Thomas did snatch her umbrella off her arm or otherwise mistreat her as Mrs. Brashear testified, that was not an arrest of her. It may have been an assault, but it was not an arrest, and there is no proof here of any arrest previous to the arrest made in the city hall under the warrant; therefore the Marshall Company was entitled to a peremptory instruction upon the unlawful arrest feature.

Upon the malicious prosecution charge, our conclusion is that Thomas had probable cause for setting it afoot. He saw Mrs. Brashear take the socks, he saw her go to another counter where she met an attendant, saw her make some purchases from that attendant without offering to pay for the socks, he saw her produce these socks from inside her coat, and what he had seen and Mrs. Brashear's highly improbable account of how the socks came to be inside her coat gave to Thomas probable cause for taking the steps he took. There is no dispute about this group of facts, and upon it the Marshall

Co. was entitled to a directed verdict. Woolworth Co. v. Connors, 142 Tenn. 678, 222 S. W. 1053.

In the case of Emler v. Fox et al., 172 Ky. 290, 189 S. W. 469, 471, after citing a number of cases, we said this:

> "These, and other cases from this court, hold that the burden of establishing malice and a want of probable cause is upon the plaintiff in a maliciaus prosecution suit, and that proof of an acquittal of the charge is not, of itself, sufficient to make a prima facie case for the plaintiff, or to cast the burden upon defendant to disprove malice or to show the existence of probable cause for instituting the prosecution. They also establish the rule in this state, and which has been such elsewhere from the earliest history of this character of action, that malice necessary to sustain the action may be presumed from a want of probable cause, but that want of probable cause will never be presumed, although actual malice be indisputably established."

Further in that case we said:

> "What facts and circumstances amount to probable cause is a question of law. Whether they exist or not, in any particular case where the evidence is conflicting, is a question of fact, to be determined by the jury. But where there is no conflict in the evidence, whether the facts shown amount to probable cause, is ordinarily a question of law for the court."

In the case of Ill. R. Co. v. Anderson, 206 Ky. 600, 268 S. W. 311, 312, we said this of malicious prosecution:

> "Such actions as this are not favored, and the right to them must not be extended, otherwise we shall soon reach a point where citizens will allow crime to go unpunished rather than risk the danger of a suit like this one should the accused perchance be acquitted; then our laws would be unenforced."

In the case of Bazzell v. Ill. Cent. R. Co., 203 Ky. 626, 262 S. W. 966, 968. which was another malicious prosecution case, we said this:

> "An action for malicious prosecution is not favored in law, and hence has been hedged about by limitations more stringent than those in the case of

almost any other act causing damage to another and the courts have allowed recovery only when the requirements limiting it have been fully complied with. The disfavor with which the action is looked upon is especially marked in cases where the suit is being brought for the institution of criminal proceedings against the plaintiff, as public policy favors the exposure of crime, which a recovery against a prosecutor obviously tends to discourage.''

This has long been the settled policy of this state, as will appear upon examination of Faris v. Starke, 42 Ky. (3 B. Mon.) 4, which was a malicious prosecution case and wherein this court said:

"The law, in its regard for the public safety, and in its detestation of crime, encourages the use of rational and inoffensive means of detecting the guilty, and of course affords protection to those who, in the fair use of such means, may be led, in good faith, to suspect, and even to prosecute those who may turn out to be innocent.

"If every man who suffers by the perpetration of a crime, were bound under the penalty of heavy damages, to ascertain before he commences a prosecution, that he has such evidence as will insure a conviction, few prosecutions would be set on foot, the guilty would escape while conclusive evidence was sought for; offenses of every grade would, for the most part, go unpunished, and the penal law would be scarcely more than a dead letter. The law, therefore, protects the prosecutor if he have reasonable or probable cause for the prosecution, that is if he have such ground as would induce a man of ordinary prudence and discretion, to believe in the guilt and to expect the conviction of the person suspected, and if he acts in good faith on such belief and expectation.''

When we consider what Thomas saw and what he did in the light of what this court has written in the cases cited, the conclusion is inevitable that the jury should have been directed to find for the defendant.

This does not mean that Mrs. Brashear is guilty, that question is not before us. she may have been entirely innocent and a jury has found that she was, but the basis of our decision is that Thomas had reasonable cause to believe that she was guilty, and, if he had, Mrs. Brashear

cannot recover. The Marshall Company is awarded a new trial, and, if upon the next trial the evidence is substantially the same, the court will direct the jury to return a verdict for the defendant.

Judgment reversed.