RENDERED: FEBRUARY 21, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky
# Court of Appeals

NO. 2024-CA-0132-MR

CORTEZZ DICKERSON AND
MACKENZIE KRAPS                                                        APPELLANTS

v.
APPEAL FROM JEFFERSON CIRCUIT COURT
HONORABLE MITCH PERRY, JUDGE
ACTION NO. 20-CI-004862

WILLIAM BOWER; BEAU
GADEGAARD; COLE GIBSON; JOEL
CASSE; AND JOSEPH DOUGHERTY                                              APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, L. JONES, AND McNEILL, JUDGES.

ACREE, JUDGE: Appellants Cortezz Dickerson and Mackenzie Kraps appeal the

Jefferson Circuit Court's January 18, 2024, Opinion and Order finding Appellees

entitled to qualified official immunity relative to certain of Appellants' tort claims

and granting summary judgment to Appellees on Appellants' claim of malicious

prosecution. We affirm as to all claims.

# BACKGROUND

As the trial court alluded in its Opinion and Order, this matter stems from a period of civil unrest in downtown Louisville in the summer of 2020. On the night in question, Appellants participated in a non-permitted, informal "caravan protest." They were driving separate vehicles. Dickerson was driving a black Jeep. Kraps was driving a silver Toyota Highlander.

As police set up roadblocks and began to clear the area, Dickerson and Kraps were among a procession of vehicles attempting to cut through a bank parking lot to exit onto Liberty Street. Kraps was positioned ahead of Dickerson in a line of vehicles attempting to exit.

Appellees Beau Gadegaard and Joel Casse, officers with Louisville Metro Police Department (LMPD), were operating an LMPD BearCat tactical armored vehicle. Officer Gadegaard was driving. The officers received a radio command to intercept a black Jeep seen in a bank parking lot. LMPD had circulated a report of men hanging out of a black Jeep brandishing assault weapons. It would turn out that Dickerson's black Jeep was not the black Jeep in question.

Officers Gadegaard and Casse approached the parking lot on Liberty Street with emergency lights activated and stopped in front of the lot's exit to block it. Dickerson's black Jeep was second in line behind Kraps' vehicle. He

broke from the line of cars to exit by way of the entrance lane.  Officer Casse urged Officer Gadegaard, "Don't let that Jeep get past you," and repeatedly told him to "pull up" to cut off Dickerson.  Dickerson jumped a curb and drove through bushes trying to exit as the BearCat pulled forward; Officer Casse then said, "Hit it."  The BearCat and the Jeep then collided at a relatively low speed.

Despite the collision, Dickerson did not stop.  His vehicle continued through bushes and struck the side of a building.  Dickerson accelerated, drove around two cars, and proceeded down Liberty Street.  When he encountered a police roadblock, Dickerson drove onto the sidewalk, nearly striking a fleeing pedestrian.  But the sidewalk was blocked by a stone fireplace in front of a restaurant, and Dickerson finally brought the Jeep to a stop there.

This all took place quickly amid chaos late at night.  Approximately seven seconds elapsed from the moment the BearCat came to a complete stop in front of the exit lane and the moment the BearCat collided with the Jeep.  Approximately thirteen seconds elapsed from the moment of that collision and the moment the Jeep came to a stop on the sidewalk.  After the Jeep stopped, the BearCat blocked it in, and Dickerson was arrested without incident.

When this sequence of events began, Kraps occupied the first car in the exit lane.  Appellees Joseph Dougherty, William Bower, and Cole Gibson, also officers with the LMPD, were already on the scene in an unmarked police car, a

silver Chevy Impala. The Impala had come to a stop on Liberty Street several seconds earlier some distance short of the exit lane. The officers were exiting the Impala and approaching the exit lane on foot when the BearCat arrived. After the BearCat collided with Dickerson's Jeep, both the Jeep and the BearCat proceeded down the street, and Officers Dougherty, Bower, and Gibson pursued them on foot. At first, Kraps remained stationary with her vehicle, but not for long.

Although video evidence provides a relatively clear account of these events, Kraps' precise movement becomes more difficult to track. As Officers Dougherty, Bower, and Gibson proceeded after the Jeep and BearCat, several cars sped down the street past the parked Impala, which had an open passenger door. Video evidence fails to capture the movement of Kraps' vehicle because it focused on unrelated fleeing cars for several seconds. When the camera operator brought the exit lane back into view approximately fifteen seconds later, Kraps' vehicle was no longer in the exit lane. Despite some obscuring by a tree, the vehicle can be seen driving toward the scene of Dickerson's arrest.

Officer Dougherty, who had initially proceeded after the Jeep and BearCat on foot, can be seen returning to the Impala, closing the passenger door, getting behind the wheel, and driving closer to the arrest scene. His body cam footage begins as he is returning to the Impala but does not capture what immediately preceded his return. However, as he gets in the car, Kraps' silver

Toyota Highlander is visible, already stopped near the arrest scene. Officer Gadegaard's body cam footage also shows Kraps' vehicle already at the scene.

Precisely what transpired between Kraps and the officers is a matter of considerable dispute. What is uncontroverted is Kraps' decision to drive closer to the scene of the officers' guns-drawn arrest of Dickerson and stop there. Twice in the span of approximately a minute, Kraps can be heard on video exclaiming, "What the fuck?" It is unclear from the video what prompted Kraps' first exclamation, but body cam footage captured Kraps' second exclamation as a response to a police officer's instruction to "Go on, back up!" The officer then directed her to "Go the other way!" Kraps did not obey the officer's instructions.

As Kraps was refusing to go the other way in her vehicle, an officer is heard directing them as follows: "Get out of the car. You want to play games? Get out of the car. Get out of the car!" Kraps' passenger got out of the car and was detained without incident. Officer Bower can be seen struggling to remove Kraps from the car, before pulling her out and pinning her to the ground to effectuate her arrest. Appellees concede Officer Bower struck Kraps with his baton in the effort to remove her. However, they testified that Kraps nearly struck Officer Gibson with her vehicle as she drove toward the scene of Dickerson's arrest, that she refused to move back when ordered, and that she kicked Officer Bower "below the belt" as he attempted to remove her from her vehicle.

-5-

Dickerson's arrest citation indicates he was arrested for violations of KRS[1] 508.060 (first degree wanton endangerment), KRS 520.095 (first degree fleeing or evading police), KRS 512.020 (first degree criminal mischief), and KRS 189.290 (reckless driving). Kraps' arrest citation indicates she was arrested for violations of KRS 508.060 (first degree wanton endangerment), KRS 508.025 (third degree assault), KRS 520.090 (resisting arrest), and KRS 304.39-117 (failure to produce insurance card).[2] Eventually, these charges were dropped, and Appellants elected to bring civil suits against the police officers involved and Louisville Metro Government for various physical torts and malicious prosecution.

Appellants' original complaint included defendants other than those named here as Appellees. Those former defendants and the claims against them, and claims against Appellees in their official capacity, were addressed in a final order from which no appeal was taken. What remained were the various physical tort claims and the claims for malicious prosecution. Appellees sought to dispense

---

[1] Kentucky Revised Statutes.

[2] In briefing this Court, both parties contend Kraps was arrested for violating KRS 519.020, obstructing governmental operations. Appellants argue the officers lacked probable cause to arrest Kraps on that charge. However, Kraps' arrest citation does not reflect that she was arrested for obstructing governmental operations. We cannot glean why they believe this to be an issue based on those parts of the record the parties cite. Therefore, we do not address it further.

with all remaining claims by filing a motion for summary judgment pursuant to CR[3] 56.

As to the various physical tort claims, the trial court took proof and entered its Opinion and Order memorializing the trial court's application of the law to the facts and concluded Appellees were entitled to qualified official immunity; those claims were dismissed on that basis.

The Opinion and Order also granted summary judgment in favor of Appellees on Appellants' malicious prosecution claims because they could not establish a lack of probable cause.

We review the disposition of those claims under the proper standards.

## DISPOSITIVE ORDER FINDING QUALIFIED OFFICIAL IMMUNITY AND THE PROPER STANDARD OF REVIEW

Appellees asserted in their answer to the complaint the affirmative defense of qualified official immunity. As is quite common, Appellees presented the defense to the trial court for resolution by filing a motion for summary judgment. That vehicle is perfectly appropriate when, *very early in the case*, it is established that there is no genuine dispute about any fact that is material to deciding the immunity issue. But that is a rare case indeed.

---

[3] Kentucky Rules of Civil Procedure.

The instant case is typical of those involving the qualified official immunity issue. The lawsuit was filed in August 2020 and did not conclude in the trial court until January 2024. Appellees' right to immunity was eventually recognized, but it did not save them from the burdens of defending the action for those forty-one months of "voluminous discovery[.]" (Opinion and Order, Record (R.) 284.) A contributing factor in such a delay as this appears to be a misunderstanding by some members of the bar that CR 56 is the preferred, perhaps sole, vehicle for determining qualified official immunity. As explained below, our Supreme Court has corrected that fallacy.

The fundamental purpose of the immunity defense is to dispense with the case by motion at the "earliest opportunity." *Rodgers v. Commonwealth*, 285 S.W.3d 740, 755 (Ky. 2009) ("While the trial courts need not address the issue *sua sponte*, once the defendant raises the immunity bar by motion, the court must proceed expeditiously."). The Supreme Court expressly rejected the idea that "discovery must be completed and all disputed facts must be resolved by a jury before a trial court can rule on the issue of qualified official immunity." *Meinhart v. Louisville Metro Gov't*, 627 S.W.3d 824, 829 (Ky. 2021). The problem is obvious. If a defendant intends to assert the immunity defense by motion for summary judgment, a plaintiff's identification of a genuine issue regarding any

-8-

material fact will defeat the immunity claim at that stage and force a trial. It will also "eviscerate the fundamental purposes of immunity." *Id.*

The fundamental purpose of the defense is "immunity from suit, that is, from the burdens of defending the action, not merely just an immunity from liability." *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 474 (Ky. 2006) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)). But the Supreme Court only recently acknowledged that "trial courts must make certain factual findings when deciding a party's entitlement to qualified official immunity[.]" *Meinhart*, 627 S.W.3d at 829. *Meinhart* thus implies that, when reviewing a claim of immunity, a trial court is not bound by CR 56 strictures.

Perhaps that was not clear enough, for Appellees still relied on CR 56 to present their immunity claim two years after *Meinhart* was rendered. If lack of clarity was a concern, a more recent Supreme Court opinion eliminates the doubt.

In *Sheehy v. Volentine*, the Supreme Court said:

> The very fact that our law requires a good faith element to discretionary acts prior to granting qualified immunity implies that *someone* will review those actions if they are the subject of a lawsuit. . . . [I]t is not a jury question . . . . [I]t is manifestly one for the trial court.

___ S.W.3d ____, No. 2023-SC-0129-DG, 2024 WL 5180785, *7 (Ky. Dec. 19, 2024) (finality Jan. 9, 2025). And if any doubt still remains about the scope of the trial court's review as including factfinding, the Supreme Court further said:

> In this capacity as a factfinder, the trial court must have the concomitant authority to judge credibility and give weight to the evidence. Unless a factual conclusion is clearly erroneous, neither the Court of Appeals nor this Court has authority to set those conclusions aside.

*Id.* at \*10.

Consequently, when a defendant moves to dispense with a claim based on qualified official immunity, the court should not restrict its analysis to the summary judgment standard of CR 56. Because factfinding is often necessary in deciding the immunity question, a different rule applies, both for the trial court and the reviewing court on appeal. "[A]n issue of weight and credibility is presented for the factfinder, subject only to the clear error review of appellate courts under CR 52.01." *Sheehy*, ___S.W.3d ____, 2024 WL 5180785, at \*6 (footnote omitted). This rule, not CR 56, applies under such circumstances.

The propriety of applying CR 52.01 principles to the question of qualified official immunity does not mean a full-blown bench trial is required. The trial court must exercise its considerable discretion to circumscribe the proceeding and focus solely on the facts in dispute that bear directly on the immunity question so as to allow an immediate appeal if denied. *Breathitt Cnty. Bd. of Educ. v. Prater*, 292 S.W.3d 883, 887 (Ky. 2009).

The party seeking immunity has the important role of honing the issue, of specifically identifying the limited and narrow factual disputes in its

-10-

motion. Although "a modicum of discovery may be necessary before the court can reasonably make the determination[,]" *Meinhart*, 627 S.W.3d at 829-30, discovery too should be finely limited until the immunity question is decided.

The distinction between applying CR 52.01 rather than CR 56 also has significance for the trial court after the hearing. A trial court has never been required to make findings of fact and conclusions of law when ruling on a motion for summary judgment pursuant to CR 56. *Toyota Motor Mfg., U.S.A., Inc. v. Epperson*, 945 S.W.2d 413, 414 n.1 (Ky. 1996) (citing *Rhorer v. Rhorer's Ex'r*, 272 S.W.2d 801, 802 (Ky. 1954)). However, whenever a Kentucky trial court determines an immunity question, it traditionally does provide more than CR 56 requires, often phrasing the order carefully to avoid the appearance of factfinding. *Meinhart* and *Sheehy* change that. That case law now clearly does require factfinding and explains very precisely how the trial court can better facilitate appellate review when making those findings of fact.

> Those findings should be complete enough to enable adequate appellate review but must necessarily be limited to the very narrow issues required to determine if immunity is applicable, including the actor's status as a government official; the ministerial/discretionary distinction; if the act was ministerial, was the actor negligent; and, if the act was discretionary, was it done in good faith and within the scope of the officer's authority.

*Meinhart*, 627 S.W.3d at 830. And that leads this Court to the standard of review for orders and judgments reached by application of CR 52.01.

***Although the trial court's review of the claim of qualified immunity under CR 56 was not improper, any factfinding Appellants assert the trial court undertook was permissible and reviewable on appeal under CR 52***.

This Court will review a trial court's factual findings regarding claims of qualified official immunity for clear error. CR 52.01. A trial court's factual findings are not clearly erroneous if they are "supported by substantial evidence. Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion, or evidence that has sufficient probative value to induce conviction in the minds of reasonable men." *Graham v. Secretary of State Michael Adams*, 684 S.W.3d 663, 675 (Ky. 2023) (cleaned up). Then, "once the material facts are resolved, whether a particular defendant is protected by official immunity is a question of law, which we review *de novo*." *Sloas*, 201 S.W.3d at 475 (citation omitted).

We apply that standard, not the summary judgment standard, to the trial court's Opinion and Order relative to the immunity claim to account for any permissible factfinding that Appellants may perceive the trial court conducted.

***Appellees were entitled to qualified immunity from the torts Appellants alleged against them***.

Notwithstanding the foregoing, Appellants argue the trial court "erred in finding that no material question of fact existed," thereby precluding summary judgment. But Appellants' arguments, perhaps instinctually, also address the trial court's allowance of more weight and credibility to certain evidence than others.

-12-

That is, Appellants' argument is primarily that the trial court relied too heavily on "the officers' version of events" as the basis of its factual findings, suggesting the "camera footage" contradicted their testimony. Therefore, we can apply the appropriate rule, CR 52.01, to determine the merit of Appellants' arguments.

*Appellees' conduct was discretionary*.

Appellants argue the officers were not pursuing an "investigation, seizure, and arrest" involving discretionary acts but, in fact, "were responding to the order of a senior officer to complete a task[,]" a ministerial function. (Appellants' Brief (Br.) at 12.) Presuming there was conflicting proof of the discretionary-versus-ministerial-acts issue here, *Meinhart* and *Sheehy* allow the trial court to choose which evidence to believe.

If, as Appellants argue, the videotape is the more weighty and believable evidence, the Supreme Court provides specific guidance. "[W]hen a discrepancy exists between the video and the in[-]person testimony, an issue of weight and credibility is presented for the factfinder, subject only to the clear error review of appellate courts under CR 52.01. This case is such a scenario." *Sheehy*, ___ S.W.3d ____, 2024 WL 5180785, at *6 (footnote omitted). The Opinion and Order reveals proper consideration was given all the evidence presented regardless of its form.

-13-

The Opinion and Order satisfies *Meinhart*'s factfinding requirements of (1) completeness sufficient to enable appellate review and (2) confinement to "the very narrow issues" of immunity. That first narrow issue was whether the Appellees' acts were discretionary or ministerial. We thoroughly examined the record before applying the standard of CR 52.01 and found no clear error in the trial court's factfinding and no abuse of discretion in its application of the law to conclude Appellees' acts on the day in question were discretionary.

The Opinion and Order reveals the trial court's awareness that "few acts are ever purely discretionary or purely ministerial." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010). Clearly, the trial court's "analysis look[ed] for the dominant nature of the act." *Id.* (emphasis omitted). We are also certain the trial court knew the law applicable to the facts in this case. Whether the command to intercept a particular vehicle was ministerial became irrelevant when Appellants created intervening circumstances that superseded any prior characterization of the nature of the officers' duty.

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to affect [sic] it." *Williams v. Commonwealth*, 147 S.W.3d 1, 6 (Ky. 2004) (citing *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989) ("right to make an arrest or investigatory stop necessarily carries with it the right to

-14-

use some degree of physical coercion or threat thereof to effect it")).  An officer's "determination of the amount of force required to effect the investigatory stop or arrest is likewise a discretionary act within the scope of a peace officer's authority."  *Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 31 (Ky. App. 2016).  *See also Graham*, 490 U.S. at 397, 109 S. Ct. at 1872 ("[P]olice officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.").

We examined the parts of the record Appellants identify as contradicting those findings but failed to find proof enough to nullify the substantial evidence upon which the decision is based.  Even if some evidence might weigh in favor of Appellants' argument, the question always returns to whether the trial court's "[f]indings . . . 'are supported by substantial evidence.'"  *Strong v. Gary*, 673 S.W.3d 77, 79-80 (Ky. App. 2023) (quoting *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003)).  In this case, they are, and they support the legal conclusion that Appellees' actions upon which Appellants base tort claims were discretionary in nature for purposes of the immunity analysis.

*Appellees conducted their duty in good faith*.

Even when a police officer's acts are found to be discretionary, he may still be liable for his actions if his conduct is not in good faith.  *Yanero v.*

*Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (Qualified official immunity "affords protection from damages liability for good faith judgment calls made in a legally uncertain environment."). However, it is not the officer's burden to show good faith. "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523. Appellants failed to meet that burden.

Appellants particularize their assertions of bad faith relative to their specific circumstances. Therefore, we distinguish their separate arguments, starting with Dickerson's claims of bad faith.

He attempts to show bad faith by arguing there were better ways of conducting the stop of his vehicle than ramming him and it should be "left to a jury to determine whether the evidence demonstrates a malicious intent to harm Mr. Dickerson." This argument is not well-taken and is expressly rejected by our Supreme Court. Allowing a jury with "20/20 hindsight to second-guess the exercise of a police officer's discretionary professional duty . . . is no discretion at all. There is considerable discretion inherent in law enforcement's response to an infinite array of situations implicating public safety on a daily basis. Appellants' contention to the contrary is without merit." *Meinhart*, 627 S.W.3d at 835.

Furthermore, Dickerson's own conduct proves the ramming was necessary. The BearCat's lights and siren did not stop Dickerson. The BearCat was placed in front of Dickerson's vehicle to block his exit, albeit with Kraps' vehicle between them, and Dickerson did not stop. Dickerson drove over a curb and through bushes and the BearCat specifically approached him, and yet he did not stop. And even after the BearCat rammed his vehicle, Dickerson did not stop.

Nothing Appellants identify in this record provides the evidence sufficient to carry their burden of showing Appellees' conduct regarding Dickerson was not in good faith. Appellees furnish no substantive argument as to why any of his proposed alternatives should have been "expected" in the circumstances at issue. Consistent with *Meinhart*'s 20/20 hindsight analysis, the Sixth Circuit Court of Appeals put Appellants' suggestions in perspective:

> [W]e must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

We find no error or abuse of discretion in the trial court's conclusion that Appellees acted in good faith in their conduct with Appellant Dickerson. We now turn to Appellant Kraps.

Kraps claims the officers approached her because she was filming Dickerson's arrest. She claims the officers' "plan to arrest [her] was done in bad faith as retaliation for attempting to document their assault of [Dickerson]." (Appellants' Br. at 19.) She ties this argument to her malicious prosecution claim (addressed below) and a lack of probable cause to arrest her. In that vein, Kraps cites a malicious prosecution opinion, *Massey v. McKinley*, for the proposition that bad faith, like "malice[,] may be inferred from a lack of probable cause." 690 S.W.2d 131, 133 (Ky. App. 1985). We decline to find an equivalency here because the separate analyses arise in completely different contexts. Additionally, even "in a malicious prosecution . . . action, lack of probable cause alone cannot support a legally sufficient inference [of] . . . an improper purpose. Independent evidence of malice is required." *Seiller Waterman, LLC v. RLB Properties, Ltd.*, 610 S.W.3d 188, 200 (Ky. 2020).

But this argument also fails because there is no evidence to support it. If Kraps was video recording anything, such video is not in the record. Even though Appellees have no proof to dispute Kraps' unsubstantiated assertion she was filming, she points to nothing supporting an inference that any officers were aware she was filming at the time, much less the officers who arrested her.

That Kraps inserted herself in Dickerson's arrest scene cannot be disputed. Her struggle with the police and resistance to lawful instructions is

followed by her forceful removal from her vehicle. No such struggle followed her passenger's obedience to instruction. And once the vehicle pursuit of Dickerson ended, his obedience to instruction was not followed by any incident.

We find no error or abuse of discretion in the trial court's conclusion that Appellees acted in good faith in their conduct with Appellant Kraps. We now turn to the summary judgment as to Appellants' claims of malicious prosecution.

## SUMMARY JUDGMENT FOR APPELLEES ON MALICIOUS PROSECUTION CLAIM

Although the trial court has been afforded the latitude to address claims of qualified official immunity pursuant to CR 52.01, and although such proceedings are best conducted very soon after the plaintiff initiates suit with a narrow focus on that alone, those are not the circumstances these Appellees presented to this trial court. Enough time passed and discovery conducted for Appellees to assert there were no genuine issues of fact and that they were entitled to judgment as a matter of law as to the malicious prosecution claims. Under such circumstances, it was appropriate to address all issues in one Opinion and Order.

Regarding Appellants' claims of malicious prosecution, the trial court applied the correct rule for testing the viability of Appellants' malicious prosecution claims – CR 56 – and we apply it on review.

***Review of malicious prosecution claim under CR 56***.

On appellate review, this Court assesses "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." *Scifres v. Kraft*, 916 S.W.2d 779, 781 (Ky. App. 1996); CR 56.03. Summary judgment "is only proper where the movant shows that the adverse party could not prevail under any circumstances." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). "Because summary judgments involve no fact finding, this Court reviews them *de novo*, in the sense that we owe no deference to the conclusions of the trial court." *Blevins v. Moran*, 12 S.W.3d 698, 700 (Ky. App. 2000).

***Summary judgment as to the malicious prosecution claims is affirmed because Appellants cannot establish a lack of probable cause to arrest them***.

A cause of action against a police officer for malicious prosecution requires proof the officer arrested the plaintiff despite *a lack of probable cause* – a material fact of the claim. *Seiller Waterman*, 610 S.W.3d at 196. Appellees moved for summary judgment pursuant to CR 56.02 and supported that motion with citation to "voluminous discovery . . . replete with evidence establishing probable cause for the arrest of both [Appellants]." (Opinion and Order, R. 284.)

Appellants could not present countervailing evidence pursuant to CR 56.03 sufficient to establish a genuine issue regarding that material fact. Instead, they cited *Craycroft v. Pippin* for the proposition that "where the evidence is

-20-

conflicting, [there] is a question of fact, to be determined by the jury." 245 S.W.3d 804, 806 (Ky. App. 2008) (quoting *F.S. Marshall Co. v. Brashear*, 238 Ky. 157, 37 S.W.2d 15, 17 (1931) (quoting *Emler v. Fox*, 172 Ky. 290, 189 S.W. 469, 471 (1916))). This principle presumes "the evidence is conflicting"; in this case, it is not conflicting. That fact brings into play the second part of the principle cited in *Craycroft* that "where there is no conflict in the evidence, whether the facts shown amount to probable cause, is ordinarily a question of law for the court." *Id.* Our *de novo* review shows the trial court properly applied the law to the facts here.

Regarding Dickerson, Appellants effectively create a straw-man argument that while the actions of unknown persons in a similar vehicle who brandished weapons gave the police probable cause as to them, the officers had to "generate[] their probable cause" to arrest Dickerson after they realized he was the wrong suspect. This fails to incorporate the fact that Dickerson committed crimes in the officers' presence that provided independent probable cause for his arrest.

The same can be said of Kraps. Appellants again argue the police "generated probable cause for her arrest by intentionally approaching her vehicle with a pre-formed intent to arrest her." (Appellants' Br. at 20.) But the record shows Kraps injected herself into Dickerson's arrest scene, refused to follow lawful police instructions, and kicked the arresting officer. We agree with the trial court that "[a]mple probable cause exists for the arrests of both [Appellants] here."

-21-

Because it was not possible for Appellants to establish a lack of probable cause, and because doing so is an essential element of a claim for malicious prosecution, the trial court properly concluded that summary judgment in favor of Appellees was proper.

## **CONCLUSION**

The Jefferson Circuit Court's January 18, 2024, Opinion and Order is affirmed.

ALL CONCUR.

| | |
|---|---|
| BRIEF AND ORAL ARGUMENT FOR APPELLANT: | BRIEF AND ORAL ARGUMENT FOR APPELLEE: |
| Ashlea N. Hellmann<br>Louisville, Kentucky | Ed Monarch<br>Bruce Paul<br>Katy Harvey<br>Louisville, Kentucky |